COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Petty, Athey and Senior Judge Clements

VALERIE BALDWIN

MEMORANDUM OPINION[*]

v.      Record No. 1994-19-3                                      PER CURIAM
                                                                 JULY 14, 2020

HARRISONBURG ROCKINGHAM
 SOCIAL SERVICES DISTRICT

FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
Clark A. Ritchie, Judge

(Shelly R. James; John Elledge & Associates, on brief), for
appellant. Appellant submitting on brief.

(Sheila Keesee Paladino, Assistant County Attorney; Sherwin J.
Jacobs, Guardian *ad litem* for the minor child, on brief), for appellee.
Appellee and Guardian *ad litem* submitting on brief.

Valerie Baldwin (mother) appeals the circuit court orders terminating her parental rights and

approving the foster care goal of adoption. Mother argues that the circuit court erred in terminating

her parental rights because she "did not create the conditions that led to the child going into foster

care." She further contends that the trial court erred in terminating her parental rights because the

Harrisonburg Rockingham Social Services District (the HRSSD) "did not meet its statutory

obligations when it failed to investigate a relative placement." Upon reviewing the record and

briefs of the parties, we conclude that the circuit court did not err. Accordingly, we affirm the

decision of the circuit court.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND[1]

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." Yafi v. Stafford Dep't of Soc. Servs., 69 Va. App. 539, 550-51 (2018) (quoting Thach v. Arlington Cty. Dep't of Human Servs., 63 Va. App. 157, 168 (2014)).

Mother is the biological mother to the child who is the subject of this appeal; the child's father is unknown. At the time of the circuit court hearing, the child was nine years old.[2] The child had been diagnosed with attention deficit hyperactivity disorder, behavior disorder including oppositional and defiant behaviors, and sleep disorder, and he was at risk for mood disorder.

The child had lived primarily with his maternal grandparents, James and June Beebe.[3] In September 2015, HRSSD received a complaint that Mr. Beebe had hit the child with a television remote, causing him to have a bruised eye. HRSSD recommended that the child and his older sister reside with mother, instead of the Beebes, due to "extreme hoarding and unsafe conditions." The child then lived with mother, her boyfriend, Rick Crawford, and her other

---

[1] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues appellant has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017).

[2] Mother has an older child, who was seventeen years old at the time of the circuit court hearing, and a set of twins, who were approximately six years old. The Rockingham County Juvenile and Domestic Relations District Court terminated mother's parental rights to the twins, who reside with their paternal grandparents. Mother's older child lives with the maternal grandparents.

[3] The Beebes also raised mother's older child.

children.[4]  Thereafter, HRSSD received reports alleging that mother and Crawford had physically abused the child and that there was "constant drinking and arguing" in mother's home.

In 2016, the child's behavior at his pre-kindergarten program was "problematic" and "escalating," so a school meeting was held to consider Therapeutic Day Treatment for the child. HRSSD offered Family Educational Services for Parent-Child Interactive Training for mother and the child to improve "the quality of the parent-child relationship and changing parent-child interaction patterns"; mother was not cooperative with the services. Subsequently, based on HRSSD's petition, the Rockingham County Juvenile and Domestic Relations District Court (the JDR court) found that the child was in need of services (CHINS). The JDR court ordered mother and the Beebes to cooperate with services and prohibited the child from spending the night at the Beebes' home "due to [the] condition of the home."

In May 2017, HRSSD moved to reinstate the CHINS petition on the docket after learning that the child had been residing with the Beebes and mother had tested positive for drugs. On June 21, 2017, the JDR court ordered mother to cooperate with drug tests as requested by HRSSD. The child continued to live with the Beebes, and the JDR court ordered them to cooperate with HRSSD and ensure that their home was safe if the child was present in the home.

HRSSD provided ongoing services to mother and the Beebes. HRSSD was aware that mother had "some significant" domestic violence history and was offered support and services. In September 2017, mother reported to HRSSD that "things had been very bad" between her and Crawford. Mother had obtained a protective order against Crawford, but later spent the weekend with him in West Virginia. HRSSD obtained child protective orders for mother's youngest

---

[4] Crawford is the biological father to mother's twins.

children, and Crawford was subsequently convicted for violating the child protective orders. In November 2017, HRSSD removed mother's youngest children from her care.

Also in 2017, the child's pediatrician referred the child to the University of Virginia Children's Hospital (UVA) due to concerns about the child's behavior. UVA met with the child and the Beebes on several occasions, and the Beebes maintained telephone contact with UVA. The child had "significant" and "heightened" difficulties at school and home. Initially, the Beebes were not interested in medicating the child; however, as the child's problems escalated, the Beebes agreed "to discuss pharmacology." Mother supported medication for the child. UVA, the child's school, and HRSSD became concerned about medication compliance, however, after it was apparent that the Beebes were unilaterally altering the child's medication.

Kim Myers, an expert in assessing and treating children with extreme behaviors and emotional needs, worked with the child as part of the Therapeutic Day Treatment program at the child's school. Myers noticed that the child was hostile and threatening toward his peers and defiant toward adults. Despite offering new interventions and positive reinforcements, Myers did not see any overall progress with the child's behaviors. Myers notified mother of the school's "general concerns" with the child; mother attended school meetings with the Beebes, but offered no suggestions.

Myers also expressed concern about Mr. Beebe's attitude and demeanor toward the child because he was "consistently hostile" and negative. During the 2017-2018 school year, the school restricted Mr. Beebe's movement within the school based on reports about his conduct. At the same time, school personnel became increasingly concerned about the child's safety and worried that he would harm himself because he had "a significant amount of energy" and was very impulsive. The Beebes acknowledged that the child exhibited the same behaviors at home, but minimized those behaviors.

On February 27, 2018, the child reported to Myers that Mr. Beebe had physically assaulted him.[5] The child stated that he did not want to return to the Beebes' house because Mr. Beebe was "mean." The incident was reported to HRSSD, which removed the child from the Beebes' home. HRSSD petitioned to place the child into foster care after finding that mother's home was not "a safe place" for the child to live because of the history of domestic violence. The JDR court entered an emergency removal order. The child was seven years old when he entered foster care.

In April 2018, the JDR court adjudicated that the child was abused or neglected and subsequently entered a dispositional order. HRSSD offered numerous services to mother to address its concerns regarding the history of domestic violence, substance abuse, and the child's special needs, but throughout the case, these barriers persisted and prevented the child from being placed in mother's care.

HRSSD required mother to be drug and alcohol free and attend all drug screenings. Mother tested positive for alcohol in April 2018, but negative in several other screenings in 2018. On January 4, 2019, mother tested positive for alcohol. Mother tested negative for alcohol and drugs in February 2019; her samples in March, May, and June 2019 were diluted and could not be tested.

HRSSD offered mother supervised visitation, which she regularly attended, and parenting education services before or after her visits. HRSSD became concerned with visits that Crawford attended due to his "negative interactions" with the child. HRSSD reduced mother's visitations with the child and later changed the visits so that mother visited with the child by herself because the visits with Crawford were not positive and "trigger[ed the child's] negative behaviors." When mother visited with the child by herself, she "continued to struggle" with

---

[5] Mr. Beebe denied assaulting the child.

meeting the child's needs and "appeared to be unsure about what to do." Mother never progressed to unsupervised visits with the child.

Despite the services, mother never demonstrated an understanding of why the child was placed, and remained, in foster care. Mother continually denied the Beebes' involvement in the abuse of the child, but in March 2019, stated that she thought Mr. Beebe "did something" to the child. She also denied that she and Crawford abused the child. HRSSD advised mother that the "main barrier" to returning the child to her home was her relationship with Crawford, who "was not committed" to having the child placed in the home, yet she continued living with him.

HRSSD required mother and Crawford to refrain from domestic violence and referred mother to a domestic violence program. Mother completed the program, but refused to attend additional classes. In February 2019, HRSSD attempted a trial home placement with mother, Crawford, and the younger children. Two weeks later, HRSSD had to remove the younger children from mother's home because mother and Crawford had argued and engaged in domestic violence.

After the younger children's removal, mother indicated that she was going to separate from Crawford, so HRSSD referred her to the Housing Authority and additional domestic violence services. By April 2019, however, mother told HRSSD that she and Crawford were planning to get married. Thereafter, mother continued to vacillate about whether she was going to stay with or separate from Crawford. In June 2019, the Housing Authority notified mother that she had come to the top of the waiting list, but mother never responded, so was removed from the housing list. On July 12, 2019, the JDR court terminated mother's parental rights to the child and approved the foster care goal of adoption. Mother appealed to the circuit court.

On October 17, 2019, the parties appeared before the circuit court. The social worker testified that HRSSD had offered mother every service that was available. HRSSD remained

concerned about domestic violence in the household. Mother testified that she and Crawford had "disagreements," but she denied arguing in front of the children. Mother knew that the child was afraid of Crawford and that HRSSD was not going to place the child with her and Crawford, yet she continued to live with Crawford.

HRSSD agreed that at the time of the circuit court hearing, mother was not "using illicit substances." HRSSD also acknowledged that mother was "successfully discharged" from the community services board. Despite completing several programs, mother's ability to recognize and meet the child's special needs did not improve.

HRSSD also presented evidence that it had investigated possible relative placements for the child. HRSSD had asked mother for a list of possible relatives, and it searched its database for possible relatives. HRSSD had determined that the Beebes would not be a good placement for the child because they refused to acknowledge their role in the child's removal, refused to cooperate with HRSSD, and failed to address Mr. Beebe's anger and inappropriate comments in front of the child.

On June 20, 2019, mother informed HRSSD that her older brother, Danny Higgins, was a possible relative placement.[6] Because Higgins lived out of state, HRSSD would have had to request an investigation through the Interstate/Intercounty Placement of Children (ICPC). Mother did not provide HRSSD with Higgins's phone number until a week later, and HRSSD was unable to reach him until the week of the termination hearing in the JDR court. Higgins indicated that he would be willing to assume custody of the child, but he did not follow up with HRSSD after the JDR court hearing. HRSSD was concerned about Higgins's ability to care for

---

[6] Mother claimed that she gave HRSSD contact information for Higgins in March 2018, but she admitted that she had received and reviewed copies of the foster care plans and had not alerted HRSSD that Higgins's name was missing as a potential relative placement. She further acknowledged that she had not "mention[ed] at any of the court hearings" until July 12, 2019, that she would like Higgins to be considered a potential relative placement.

the child because he was not aware of the child's special needs and why he was in foster care. Mother admitted that she had not spoken with Higgins about the child's diagnoses.

Higgins testified that he was interested in being a placement for the child, but acknowledged that he did not have a "strong relationship" with the child at that time. Higgins had lived and worked in Indianapolis for more than two years; he and his wife lived in a one-bedroom home with a den. Higgins had babysat the child when he was a baby and had "dealt with him as far as his little temper tantrums" when Higgins visited Mrs. Beebe. Higgins last saw the child in February 2018, before HRSSD removed him from the Beebes' custody.

Higgins had spoken with his mother, Mrs. Beebe, on a regular basis and knew that the child had been placed in foster care; however, he had not asked for the phone number for the social worker or the guardian *ad litem*. Initially, Higgins did not want to be considered a placement for the child, and it was not until mother asked him to go to the termination hearing in the JDR court that he indicated his willingness to care for the child. Since the termination hearing in the JDR court, Higgins had not made any efforts to learn about the child's behaviors or diagnoses, but stated that the child's behavioral issues would not affect his commitment to the child.[7]

At the conclusion of the evidence and the parties' arguments, the circuit court took the matter under advisement. On November 7, 2019, the circuit court issued a letter opinion, finding that mother had "made almost no progress on the issues that were the basis of [the child's] removal and placement into foster care." In addition, the circuit court found that it would not be in the child's best interests to be placed with the Beebes or Higgins. The circuit court terminated mother's parental rights under Code § 16.1-283(C)(2) and approved the foster care goal of

---

[7] Higgins testified that he had helped raise six stepchildren, four of whom had special needs, including bipolar disorder, schizophrenia, attention deficit hyperactivity disorder, and attention deficit disorder. Higgins's stepchildren were adults and no longer living with him.

adoption. On November 21, 2019, the circuit court entered orders memorializing its rulings.[8] This appeal followed.

ANALYSIS

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Castillo v. Loudoun Cty. Dep't of Family Servs., 68 Va. App. 547, 558 (2018) (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190 (2011) (quoting Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20 (1986)).

*Termination of parental rights*

Mother argues that the circuit court erred in terminating her parental rights because she did not create the conditions that led to the child's placement in foster care and she had remedied the conditions that led to the child's continued placement in foster care.

The circuit court terminated mother's parental rights under Code § 16.1-283(C)(2), which states that a court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

---

[8] At the same time, the circuit court entered an order denying the Beebes' petitions for custody and visitation of the child; the Beebes, acting *pro se*, appealed that ruling. See Beebe v. Harrisonburg Rockingham Social Services District, Record No. 0349-20-3.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." Yafi, 69 Va. App. at 552 (quoting Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271 (2005)).

The circuit court found that mother was "in almost the *exact same position*" with respect to her relationship with Crawford and substance abuse as she had been when the child entered foster care. (Emphasis in original.) The circuit court concluded that mother had "either failed to complete the substantial services afforded to her by [HRSSD] or she ha[d] completed them and nothing [had] changed." HRSSD had been involved with the family for years before the child's removal. HRSSD reported that it had offered all of the services it could, but mother lacked the skills to care for the child.

One of the barriers to the child returning to mother's care, and therefore required continuation of the child's foster care placement, was domestic violence within her home. HRSSD presented evidence that there were repeated instances of domestic violence between mother and Crawford. HRSSD had referred mother to a domestic violence program, and despite completing it, she did not take additional classes as recommended. Mother had obtained a protective order against Crawford and reported on multiple occasions that she was afraid of him. HRSSD had referred mother to the Housing Authority so that she could obtain her own separate residence, yet when housing became available, she did not respond and lost her opportunity for independent housing.

Moreover, even though the child had expressed fear of Crawford and Crawford had expressed no interest in helping mother obtain custody of the child, mother continued to live with Crawford. Mother's situation never changed. The circuit court found that mother and Crawford had a "dysfunctional, tumultuous, and often violent relationship." The circuit court further found

that mother had "done little, if anything, to address the issues of domestic violence in her life and home."

Another barrier to the child returning to mother's case was her history of substance abuse. HRSSD had presented evidence that in August 2018, mother was too intoxicated to drive after she and Crawford were engaged in a domestic violence incident, and mother had called the police to assist her and drive her to the Beebes' house. Mother tested positive for alcohol in January 2019 and was diluting her testing samples in early 2019. The circuit court found that mother had not remedied her issues with substance abuse. It recognized that mother's alcohol consumption had been "an issue" throughout the child's life and continued while the child was in foster care.

At the time of the circuit court hearing, the child had been in foster care for approximately twenty months. The circuit court concluded that "[o]ver the last twenty (20) months, [mother] ha[d] made almost no progress on the issues that were the basis of [the child's] removal and placement into foster care." Meanwhile, the child was "doing well" in his current foster home, and the foster family was "suited to meet his special needs." "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Tackett v. Arlington Cty. Dep't of Human Servs., 62 Va. App. 296, 322 (2013) (quoting Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540 (1990)).

Based on the totality of the record, the circuit court did not err in terminating mother's parental rights under Code § 16.1-283(C)(2).

*Relative placement*

Mother argues that the circuit court erred in finding that HRSSD had met its statutory obligations to investigate a relative placement before seeking to terminate her parental rights and

in finding that it was not in the best interests of the child to place him with Higgins. Mother asserts that HRSSD should have considered Higgins as a possible relative placement earlier to preserve the family unit.

Before terminating a parent's rights, "the court shall give a consideration to granting custody to relatives of the child, including grandparents." Code § 16.1-283(A). "This Court has held that this provision obligates [DSS] 'to produce sufficient evidence so that the court may properly determine whether there are relatives willing and suitable to take custody of the child, and to consider such relatives in comparison to other placement options.'" Castillo, 68 Va. App. at 567 (quoting Brown v. Spotsylvania Dep't of Soc. Servs., 43 Va. App. 205, 217 (2004)). Accord Hawthorne v. Smyth Cty. Dep't of Soc. Servs., 33 Va. App. 130, 136 (2000); Logan, 13 Va. App. at 131.

"Although mandatory, this obligation is limited." Castillo, 68 Va. App. at 567. We have never "suggest[ed] that HRSSD has a duty in every case to investigate the home of every relative of the children, however remote, as a potential placement." Sauer v. Franklin Cty. Dep't of Soc. Servs., 18 Va. App. 769, 771 (1994). Instead, our precedent establishes that the statutory prerequisite is satisfied when the relative testifies before the circuit court, so that it may consider the suitability of placing the child with that relative, as compared with other placement options. See Castillo, 68 Va. App. at 568 (trial testimony of "several relatives" and evidence of Department's investigation provided circuit court with "ample evidence" to consider relative placements); Brown, 43 Va. App. at 218 (statute satisfied where grandmother "testified at the hearing and informed the court of her 'suitability and willingness' to take [minor] into her custody); Hawthorne, 33 Va. App. at 139 (statute satisfied where the trial court heard testimony of father's aunt concerning her willingness and suitability for placement before it ordered the termination of his parental rights).

- 12 -

HRSSD presented evidence regarding its investigation of possible relative placements. Mother acknowledged that she did not alert HRSSD that Higgins was not listed on the foster care plans as a possible placement until June 2019. HRSSD was unable to contact Higgins until the week of the termination hearing in the JDR court. Higgins testified at the JDR court hearing, but did not follow up with HRSSD after the hearing. Higgins also testified at the circuit court hearing, so the circuit court had the opportunity to evaluate him as a possible relative placement.

The circuit court found that Higgins had a "very limited history" with the child and was "notified at the last minute about being a possible placement" for the child. Although Higgins had "the best intentions," he would have to "adjust his living arrangements in a substantial way to provide adequate housing" for the child. The circuit court found that it was not in the child's best interests "to be sent to Indianapolis with an uncle he does not know well at all when he has a current support system locally that is actively addressing his special needs." Acknowledging that termination of parental rights was "an extraordinary remedy," the circuit court found that there were no suitable relative placements and that the termination of mother's parental rights was in the best interests of the child.

"Because this Court defers to a lower court's judgment based on evidence heard *ore tenus* unless plainly wrong or without support, Logan, 13 Va. App. at 128, it does not disturb the circuit court's ruling that no relatives were suitable placements." Castillo, 68 Va. App. at 568. Based on the totality of the record, the circuit court did not err in finding that there were no suitable relative placements.

CONCLUSION

For the foregoing reasons, the circuit court's ruling is affirmed.

Affirmed.